FREMONT COUNTY v. THE BURLINGTON & MISSOURI RIVER RAILROAD COMPANY.

MILLS COUNTY v. SAME.

1. Swamp lands: SWAMP AND RAILROAD LAND GRANTS: LEGISLATIVE HISTORY. The federal and State legislative history of the swamp land and railroad grants stated and discussed.

2. —— SWAMP LAND SELECTIONS: MILLS AND FREMONT COUNTIES. In the selection and listing of the swamp and overflowed lands in Mills and

Fremont counties there was no irregularity, or departure from the instructions of the interior department.

3. —— INVESTMENT OF TITLE IN THE STATE. The meaning and intent of the act of Congress of March 3, 1857, confirming and approving the selections of swamp lands that had been made and reported to the commissioner of the general land-office, so far as the same remained vacant and unappropriated, and directing the certification of the same to the States, *was*, to vest absolutely in the several States the title to such of their swamp and overflowed lands, whether actually so or not, as had before that time been so listed and reported.

4. —— IN FREMONT AND MILLS COUNTIES. The title of the swamp and overflowed lands in Fremont and Mills counties (granted to the State, act of Congress, Sept. 28, 1850), remaining vacant and unappropriated, that had been selected and reported to the general land-office, was, by the act of Congress of March 3, 1857, immediately vested in the State.

5. —— RIGHT TO CERTIFICATION. The right of the State to then demand their certification became perfect, and this *right* is equivalent to the title.

6. —— RAILROAD LAND GRANTS. The act of Congress approved May 15, 1856, granting lands to the State of Iowa in alternate sections to aid in the construction of certain railroads in said State, having reserved from its operation all lands that had been before appropriated for any other purpose whatsoever, or which should have been granted when the lines of said road should be definitely fixed, did not disturb or affect the title to the swamp and overflowed lands in Fremont and Mills counties that had been confirmed to the State prior to the time when the final location of the line of the Burlington and Missouri River railroad was definitely determined.

7. —— CERTIFICATION VOID. The act of the commissioner of the general land-office, of March 25, 1862, certifying these lands to the Burlington and Missouri railroad company, being in contravention of the vested rights of the counties, was ineffectual and void, and the same may be inquired into and so declared by the courts.

8. —— ACTS OF EXECUTIVE OFFICER : VIOLATION OF VESTED RIGHTS. When acting within the scope of his authority and not in contravention of previously acquired substantial rights, the acts of an executive officer of the government in disposing of public lands, and the title acquired thereunder, will not be allowed to be impeached collaterally. But, on the other hand, if he violate vested rights, though, in the certification of lands previously granted by Congress, such violation falls within the judicial cognizance of the courts, the same as if the right had been invaded by the legislative department or by an individual.

*Appeals from Fremont and Mills District Court.*

FRIDAY, APRIL 12.

THESE cases, being identical in principle, and but little variant in their facts, will be jointly considered and determined. They are applications in chancery, in which the plaintiffs set up a paramount claim to certain swamp and overflowed lands therein described; with which it is charged the defendant is unlawfully interfering, and they ask that their title to and enjoyment of the same may be quieted. This prayer the court below, on hearing, granted, and the defendant appeals. Other facts essential to the development and adjudication of the cases will sufficiently appear in the opinion of the court.

*David Rorer,* for the appellant, in the course of his argument, submitted the following points and authorities:

1. The bill is bad on general demurrer. It alleges the ownership of the lands to be in plaintiff. Ownership means *legal* title. Webster's Dic., " *Owner* "—" Ownership;" 2 Black. Com., 195; 2 Bouv., 539. If plaintiff has the legal title, then there is a remedy complete at law. This is too clearly settled to require authorities. See, however, *Allison* v. *Halfacre,* 11 Iowa, 151; *Roberts* v. *Tallifaro et al.,* 7 Iowa, 110; *Fejervey* v. *Langer,* 9 Iowa, 159; *Eldridge* v. *Hill & Murray,* 2 John. Ch., 281; *Lowe* v. *Lowrey,* 4 Ham., 77.

Nor can it be said that the purpose is to avoid a multiplicity of suits at law against those who may have become claimants of the different tracts under defendant. For such a case, plaintiff must first *establish* his legal title by action at law as to some one or more of the tracts of land involved in the same controversy.

But we have not demurred; we leave the court to enter-
tain jurisdiction in equity, or not, at its discretion.   The
decree shows that the lower court *found* the *legal* title *in*
plaintiff.   If, on the other hand, plaintiff has not the
legal title, then the bill is untrue and should be dismissed;
for it makes no other state of case.   The recovery, if at
all, must be *allegata et probata*.

2. The swamp land grant is a specific grant.   The term
" swamp and overflowed lands " is used in the act in refer-
ence to those lands *described* as such in the surveys, field-
notes, plats, and books of the land department of gov-
ernment.   Hence the secretary of the interior and com-
missioner of the general land-office correctly measured
the extent of the grant as confined to those lands returned
as " swamp and overflowed lands."

The laws of Congress require United States surveyors
to note and return description and quality of lands sur-
veyed, with field-notes, etc.   Act of May 18, 1796, and
subsequent acts in reference thereto; Lester's Land Laws,
18; Brightley's Dig., 466, 493, 494, etc.

The lands granted by the act of 1850, and subsequent
acts, as swamp, were as clearly defined as were the school
lands, salt lands and mineral lands on the books of the
department.   The grant is the same as to have said, " all
those lands returned as *overflowed and swamp*."   In illus-
tration of this, apply the language of the act:

" It shall be the duty of the Secretary of the Interior,
as soon as may be practicable, to make out an accurate
*list* and *plats* of the lands *described* as aforesaid, and trans-
mit the same to the Governor, etc., and at his request to
cause a *patent* to be issued to the State therefor."   Act of
September 28, 1850; Lester's Land Laws, 169.   Here the
word " *described* " is evidently used in reference to the
files and books of the department.   Were it otherwise,
some means would have been afforded to the secretary of

ascertaining what lands were in *fact* swamp. No re-survey, no *personal* examination, as in the Louisiana grant of 1849; but evidently the lists and the plats are to be made from the returns in the department. This is rendered more certain by the last section of the act of 1850, which extends the benefit of the act to all the other States (save Louisiana) in which such "swamp and overflowed lands KNOWN and DESCRIBED *as aforesaid* may be situated." Lester's Land Laws, 170.

It results from this, that all orders of the department allowing Governors to make swamp land selections, and all State legislative acts contemplating selections, are simply void. For Congress alone may define the extent and the mode of measuring the grant. *Wilcox* v. *Jackson*, 13 Pet., 517; *Irvine* v. *Marshall* and others, 20 How., 558; *Jourdan et al.* v. *Barrett et al.*, 4 Id., 169. This disposes of all State acts and State selections.

3. *The legal title, with superior equity, is in defendant.* When lands are granted by a law contemplating a *patent*, then the legal title passes *only by patent*. But when lands are granted by a law which in itself (for want of identity) does not convey the fee simple, and yet *does not provide* for or *require* the issuing of a patent, then the title passes by *lists* of the lands, to emanate from the land department. Act of Congress, Aug. 3, 1854; Lester's Land Laws, 236. *And this act* is also *retrospective, in express terms.*

The original swamp land act of 1850 and the confirmatory act of 1857, both require patents to issue to carry title. None have issued for the lands in suit, to plaintiff or the State. The act under which defendant claims requires no patent, but *provides* for lists—defendant has the lists, and these lists, with the grant from the State, confer the legal title. The lists are *to the State for defendant*, and a legislative grant to defendant from the

State. By plaintiff's own showing, the patent was *denied* by the department *under the* swamp land grant, and the lands were listed to the State under the railroad grant *for defendant. This is the burden of plaintiff's complaint.* These lists are in evidence. They vest the title in defendant by a congressional grant which is of higher character than a patent. Lester's Land Laws, 258; *Grignon et al.* v. *Astor et al.*, 2 How., 319.

So soon as our lists identified the lands, both within the original six miles, and within the subsequent limits, the title passed to the defendant, and, by *relation,* dates back to the date of the original grant, or, at all events, to the date of survey, which survey and location on the ground was in October, 1856. *Landees* v. *Barrett,* 10 How., 348; *Lessuir and others* v. *Price,* 12 Id., 59. The *confirming* act relied on by plaintiff, unlike this, *does not so retroact by relation,* as to override an intermediate grant. If it gives title at all, it is from its own date. *Les Bois* v. *Bramel,* 4 Id., 499; *Choteau* v. *Eckhart,* 2 Id., 345. So, the doctrine of *prior in time, prior in right,* is with defendant, although the swamp land act is the oldest.

The effort of the State to *disclaim* the trust as in favor of defendant and to *affirm* it in favor of plaintiff, cited by plaintiff, is *of no force.* It places the State in a false position. A trustee cannot meddle with the trust fund to enlarge, diminish, or divert it, in any case, much less the estate in regard to a government grant of land. As previously shown, the United States alone may declare the extent of the grant, and the manner of identifying it, and of passing title. *Irvine* v. *Marshall et al.*, 20 How., 558; *Wilcox* v. *Jackson,* 13 Pet., 517; *Jourdan* v. *Barrett,* 4 How., 169.

4. Failing under the act of September 28, 1850, plaintiff next relies on the act of March 3, 1857. Les-

ter's Land Laws, 285. But this act (as before stated) also contemplates a patent. And the *approval* of the *selections* by the department for this act, being in aid of the original act of 1850, which required the judgment and *approval* of the department, the term approval will be applied as in the original act. Nor is a mere *mechanical* conformity intended by a mental adjudication and approval of the result. Otherwise the act itself would serve instead, and no approval would be necessary. An *adjudication* is required as to whether the lands were "appropriated," and an exclusion of such as should be found to have been appropriated, and an approval of the lists as to the residue, if any. Such was the action of the department. The act of Congress of 1857 confirms only such lands as *remain unappropriated, etc.* Now, if the lands were not returned by the original survey as *swamp,* so as to pass by that *description* under the swamp land grant, by the act of 1850, then they were, at the date of the act of 3d March, 1857, *appropriated;* for prior to that time they had passed by the railroad grant of 15th May, 1856, and the subsequent survey and location of the road.

Moreover, if it be answered that the confirming act refers to the Louisiana grant of 1849, and that, therefore, the terms of that grant should be applied to the question at bar, the reply is, that the confirming act was not passed for Iowa alone, but for all the States—*Louisiana included.* Those in Louisiana were confirmed according to the terms of her grant, and those in the other States were confirmed in accordance with the subsequent act of 1850. Hence the words "*granted to the several States*" in the act of 3d March, 1857. This view is corroborated by the following language of the confirming act: "And shall be *approved* and *patented* to the several States in *conformity with the provisions of the act aforesaid.*"

VOL. XXII.—13

That is, in conformity to the respective original acts as they severally apply to the different States, of Louisiana, and the other States referred to in the subsequent act.

Not only the PATENTING, but the *approval* is to be in accordance with the original act. That is in each case of the two classes of cases; each under its own act. The granting acts and the confirming act are in *pari materia*, and must be construed together. Sedg. on Stat. and Const. Law, 247, 248, 249, 250; *State of Indiana* v. *Springfield Township* (involving acts about school lands), 6 Ind., 83. The meaning of the law is to be ascertained from the language thereof, and not from extraneous facts or circumstances. Sedg. on Stat. and Const. Law, 241–7.

It is not contended that the act of 2d March, 1849, has any bearing on the Iowa swamp land grant. If it should be so contended, we here remark that under that act the selections were to be made, *not* by the counties, nor State, nor by *interested individuals;* but by "*experienced* and *faithful deputies*" of the United States surveyor-general. There is no pretense that this was done in Iowa. The selections were, in either event, without authority of law, a mere meddlesome interposition in the duties of the national government. It involves not a mere *irregularity*, but a *want of power*. Neither the State, the Governor, the counties, nor individuals, had any authority of law for selecting the lands; nor the surveyor-general for reporting their selections, nor the department in conferring on the State the privilege. The United States alone may discharge these functions through officers of the proper departments. *Elliot et al.* v. *Piersol et al.*, 1 Pet., 340; *Haydell* v. *Dufresnee*, 17 How., 24; *Willcox* v. *Jackson*, 13 Pet., 511; *Irvine* v. *Marshall et al.*, 20 How., 558; *Jourdan* v. *Barrett*, 4 Id., 169.

5. *The decision of the secretary of the interior is in the defendant's favor, and is final.* On this point, the

Fremont and Mills Counties v. The Burlington and Mo. R. R. Co.

Supreme Court of the United States hold that where, under an act of Congress, the secretary of the treasury had the power to *select*, that his decision is "*conclusive*." *Campbell* v. *Doe*, 13 How., 249. And the same is the effect, if the decision emanates from the commissioner of the general land-office, who acts under the secretary's supervision. True it is, that the case last cited involved the action of the treasury department, performed before the interior department was organized; but, by law, the like power was vested in the interior department when it was created, and therefore the decisions of the interior secretary are alike final in like cases. *McGuire* v. *Tyler*, 1 Black., 202. Where the law specially refers a matter to the secretary or other officer, his decision, if "*honestly made*," is "*conclusive*." *Hydell* v *Dufresnee*, 17 How., 23–30. The cases before us do not involve any sufficiently alleged fraud in the defendant or department, but simply error in the secretary in deciding what was confided to his judgment.

In the case last cited, where back lands were granted to front proprietors, to be divided among them by United States surveyors, in a suit involving the action and decision of these officers, there being *no fraud alleged*, the Supreme Court held that neither State nor federal courts could interfere to control their acts; and that "great confusion and litigation would ensue" from such interference; that such interference, if allowed, *might suspend the action of the United States* (and its departments) altogether.

*Henry Strong* for the appellant, in the course of an elaborate printed argument, in which he reviewed at length the arguments of appellee's counsel and the authorities cited therein, submitted, among others, the following points and authorities:

1. The act of September 28, 1850, did not operate as a

grant *in presenti*, and did not, of its own force and unconditionally, pass to the State all the right and title of the United States in and to all those lands that were of the character contemplated by said act. No title passed to the State without the approval of the secretary of the interior, and a patent from him.

2. The decision of the secretary of the interior, that the lands in controversy were not swamp lands, in refusing to certify them to the State as such, and in certifying them as railroad lands, is final and conclusive.

Congress clearly had the right to make such a disposition as they chose, and on such terms as they chose, of any part or all of the public domain. Congress had full authority to grant to the States all of a certain class of land, and to appoint an officer or agent of the government, with power to determine what lands were of that class; and to limit the grant to such lands as the agent constituted by Congress should decide to be of the class or kind named. No one can doubt the power of Congress to do this, and to prescribe in the granting act how the title should pass.

Congress very well knew that the States would convey these swamp lands to the counties, and they would soon (as they have done) fall into the hands of " land sharks " and speculators, who would prove by each other, and swear, that everything was swamp land, and thus rob the government of her whole public domain. They could prove anything before a local court and jury, that were all interested in getting as much land for the county as possible. The government never designed to do so, nor did place itself in such a position that it or its grantees should or could be called upon to try the question of fact before some interested local tribunal, as to whether each particular forty acres, of the millions of acres of public land within each State, was or was not swampy, at the date of

the act of 1850, or at any other time. The mere statement of such a proposition exposes its utter absurdity, and no court can so construe the act in question without impeaching the common sense or integrity of Congress. This court cannot for a moment suppose that such was the intention of Congress. The expense of thus settling the question as to the character of these lands, would be much greater than the whole value of the lands involved.

The act itself, for the very *purpose of avoiding*, thus, the practical surrender by the government of her public lands, under this act constituted the secretary of the interior a judge to determine what lands were included in the grant and to patent them to the States, and on the patent the title should pass. It was because the land proposed to be granted was not described by metes and bounds, was not limited in quantity, in miles or acres, was indescribable by the nomenclature of the land-office, was wholly indefinite, and might become, and surely would become, a source of trouble unless guarded, and the grant be subjected to intolerable abuse unless the government should retain some control in the important matter of defining and determining what land was embraced in the act. It was for these and other considerations, that the secretary of the interior, the highest land officer of the government, who by law is the especial custodian and guardian of the public domain, was appointed and declared by the act in question to be the judge and umpire of what was embraced by the act, and his hand and the seal of his office should be required to divest the government of its title to and control over the land in question.

It would have been a different case had the character of the thing granted been more definite and less liable to be questioned. Honest men, knowing all the facts, differ as to whether certain land is or is not swampy. There is

no technical meaning to the words "swamp lands." It makes it no clearer to say, if the greater part of a forty acres is swampy, it shall be classed as "swamp land." The question recurs, what is swampy? How swampy does it have to be in order to be called swampy? Men differ, differ widely about this. Hardly any two would decide alike as to many pieces of this land. The government did not intend to be compelled to come down into the lists and contest this question before the local tribunals, therefore Congress constituted a common judge and arbitrator, whose decision is final and conclusive. It was on account of the nature of the grant—its indefiniteness growing out of the thing proposed to be granted—that this provision was made. It was to avoid such testimony as plaintiffs seek to introduce here, that this protection was thrown around the administration of the grant.

The United States are concluded by the act of the secretary of the interior, whenever he, in good faith, and in the exercise of the discretion with which he is clothed, patents lands to the State, under this act, as swamp lands, which are not in fact swamp lands; and there is no appeal by the government from his decision. For a much stronger reason, the State — the grantee of a naked gift, without consideration — is concluded when the same officer and constituted agent of the government, in the exercise of that same discretion, lists and certifies any land as dry land, even though it may in fact be swampy.

See letter of Hon. R. McClelland, secretary of the interior, to Reverdy Johnson, Nov. 10, 1856 (Lester's Land Laws, 507); Opinion of the President (Id., 508); Letter of Sec. of Interior to Com. of Gen. Land-Office, Nov. 20, 1855 (Id., 521); Letter of J. Thompson, Sec. of Interior, to Com., April 10, 1859 (Id., 534, 535); see Instructions by the Commissioner of the General Land-Office, of date of December 21, 1853, to the Surveyor-

General of Arkansas, in regard to selections of land under this law (Lester's Land Laws, p. 551) ; Letter of Sec. of Interior to Com., July 7, 1855 (Lester, 552) ; Circular of Thos. A. Hendricks, Sec. of Interior, to local land officers, Feb. 11, 1855 ; Letter of Hon. J. Thompson, Sec. of Interior, to Com., Feb. 8, 1860 ; Letter of Caleb B. Smith, Sec. of Interior, to Com., March 4, 1862 ; Letter of Com. of Gen. Land-Office, to Gov. Kirkwood, June 3, 1862 ; Circular of Com. of Gen. Land-Office to local land officers, Feb. 11, 1856 (Id., 548) ; see also the following adjudicated cases: *Lytle* v. *The State of Arkansas*, 9 How., 314 ; *Glenn* v. *United States*, 13 Id., 258 ; *West* v. *Cochran*, 17 Id., 403 ; *Magwire* v. *Tyler*, 1 Black. R., 195 ; *Hydell* v. *Dufresnee*, 17 How., 23 ; *Wilcox* v. *Jackson*, 13 Pet., 511 ; *Bagnell* v. *Broderick*, 13 Id., 436 ; *Landes* v. *Brant*, 10 How., 348 ; *Campbell* v. *Doe*, 13 Id., 244. As to the construction of public grants, see *Ohio Ins. & Trust Co.* v. *Debolt*, 16 How., 416.

*J. A. Harvey* for Fremont county, and *William Hale* for Mills county, in the course of full and lengthy printed arguments, submitted the following points and authorities.

I. The act of September 28, 1850, of its own force and unconditionally passed to the State of Iowa all the right and title of the United States in and to all these lands that were of the character contemplated by that act, that is, all that were actually "swamp or overflowed lands" at the date of the passage of the act. *Godfrey* v. *Beardsley*, 2 McLean, 412 ; *Lessieur* v. *Pierce*, 12 How., 60 ; 2 Wheat., 196 ; *United States* v. *Brooks*, 10 How., 460 ; Opinion of the Commissioner of the General Land-Office, Mr. Butterfield, in circular to the local land-offices, of November 21, 1850 ; Lester's Land Laws, 543 ; Opinion of Mr. Stuart, the succeeding commissioner, of December 23, 1851 ; Lester's Land Laws, 549 ; Opinion

of Attorney-General Black of June 7, 1857 to the Secretary of the Interior, wherein he refers to *United States* v. *Perchman*, 7 Peters, 51; *Mitchell* v. *United States*, 9 Peters, 711; *United States* v. *Brooks*, 10 How., 442; *Leuener* v. *Price*, 12 Id., 59; *Lagina* v. *Roland*, 2 Id., 581; and *Godfrey* v. *Brodley*, 2 McLean, 412; Lester's Land Laws, 525; Opinion of Attorney-General, of Nov. 10, 1858; Lester's Land Laws, 564. This last opinion was rendered in a case precisely similar to the one at bar, *Allison* v. *Halfacre*, 1 Iowa, 450; *Arnold* v. *Grimes et al.*, 2 Iowa, 16; *County* v. *District Court, etc.*, 23 Mo. (2 Jones), 449; *Cooper* v. *Roberts*, 18 How., 173.

II. The lands in controversey were swamp and overflowed lands at the passage of the grant, as shown by the depositions taken on behalf of plaintiffs.

III. The act of Congress of March 3, 1857, confirming the swamp land selections, perfected the right of the State to all the lands selected as swamp and overflowed under the act of 1850, and at the date of said act of March 3, 1857, reported to the general land office, whether the land was wet or dry, unless in the mean time they had been otherwise legally disposed of.

1. This confirmatory act is entitled " An act to confirm to the several States the swamp and overflowed lands selected under the act of September twenty-eight, eighteen hundred and fifty, and the act of the second March, eighteen hundred and forty-nine ;" and it unconditionally confirms to the States all lands selected as swamp, and reported prior to that date to the commissioner of the general land-office, " so far as the same remained vacant and unappropriated, and not interfered with by an actual settlement under any existing law of the United States." Lester's Land Laws, 285.

2. Prior to the passage of this act, the interior department allowed parties desiring to do so to contest the claim

JUNE TERM, 1867. **105**

Fremont and Mills Counties v. The Burlington and Mo. R. R. Co.

to any lands claimed as swamp, and to offer evidence to show that they were not of the character contemplated by the act of September 28, 1850 (see Lester's Land Laws, 544, and 545 to 548); but immediately after the passage of the confirmatory act, to wit, on the 18th March, 1857, the commissioner published a notice dismissing all such cases, and declaring that said act precluded the department from investigating the character of the land, and that it confirmed to the States under the swamp grant all lands selected and reported, not *legally* otherwise appropriated. Lester's Land Laws, 549.

3. This view of the act of 1857 is affirmed, declared and reiterated by the secretary of the interior, in his communications to the commissioner, of date January 8, 1858, November 1, 1858, and July 23, 1859. Lester's Land Laws, 558, 563, 570.

IV. These lands having been selected and reported to the commissioner of the general land-office prior to the 3d of March, 1857, were, by the act of that date, confirmed to the State as swamp lands, unless the defendant had *vested rights* therein at that time.

*But no rights had vested in the railroad company, nor could any rights possibly accrue under the railroad grant,* for the following reasons:

1. These lands had previously been selected as swamp, and *were swamp lands,* and the government having parted with her right to them by the act of 1850, as before seen, they could not be subject to the railroad grant at all.

2. These lands were selected and returned to the general land-office as swamp lands, *and were, by order of the interior department, withdrawn from market and reserved from sale for the purpose of carrying out the act of* 1850. They were not, therefore, subject to the rail-

road grant, and they were also expressly excepted therefrom by a provision in the grant itself. ·

See certificates of the register of the land-office at Council Bluffs, and copy of commissioner's letter, in evidence.

3. This order of the commissioner and the entries on the books and maps of the land-office withholding the land from sale, were in full force on the 15th of May, 1856, when the railroad grant was made, and also at the . time of the location of the line of road and its adoption by defendant, and constituted an " appropriation " of these lands for the specific purpose of satisfying the grant of 1850, and being so " appropriated " they did not and could not pass by the act of 1856.

As to the definition of and what constitutes an " appropriation," see *Wilcox* v. *Jackson*, 13 Pet., 498; *Chotard* v. *Pope*, 12 Wheat., 586 ; Decision of Secretary of Intc rior, of Nov. 20, 1855 (Lester's Land Laws, 521); *Hoofnagle* v. *Anderson*, 7 Wheat., 212 ; *Jackson* v. *Clark*, 1 Pet., 628; Opinion of Attorney-General Crittenden, Vol. 3 ; Opinions of Attorney-Generals, 650 ; Opinion of Attorney-General Butler, Id., 274, 277 ; Opinion of Attorney-General Cushing in the case of *Faust* v. *Faust*, vol. 8, Id., 16 ; same in case of *Rock Island Reservation*, vol. 6, Id., 670.

4. The railroad grant, unlike the swamp grant, did not at the time of its passage attach to any *particular lands*.

It was a grant in the nature of a "float"—a grant which could only attach to the unsold lands in odd sections, within a certain distance of a contemplated line. That line could have no *actual existence*, and therefore no *location* till laid out and determined.

The lands in controversy were *otherwise appropriated*, and fully disposed of under the *swamp grant* prior to the definite location of defendant's line of road.

The location of the line determines the application of the grant to the particular tracts of land, and until that location is made it is *uncertain* and *wholly unknown* upon what tracts the grant will fall. Therefore, no right whatever can possibly attach, under this grant, to any particular tracts of land till the line of road is *definitely fixed*. (See the grant).

"Definitely fixed" means "permanently located"—fixed beyond the power of either party, State or general government, to change it without the consent of the other. Simply surveying and staking of the line "fixes nothing," and is not sufficient. Attorney-General Cushing's opinion of Dec. 19, 1856 (Lester's Land Laws, 512); Attorney-General Black's opinion of June 7, 1857 (Id., 525); Secretary Thompson's decision of Aug. 5, 1858 (Id., 530); Secretary Thompson's decision of April 6, 1858 Id., 533); Secretary Thompson's decision of April 21, 1859 (Id., 537); Secretary Thompson's decision of August 20, 1859 (Id., 541); *Hud. & Del. Canal Co.* v. *N. Y. & Erie R. R. Co.*, 2 American Railway Cases, 585.

5. The lands in controversy in this suit are all outside of the six-mile limits of the line of said railroad, as will fully appear from the lists put in evidence by the defendant.

V. The act of the commissioner of the general land-office, and the secretary of the interior, in rejecting the claim of the State to these lands as swamp, and certifying them as railroad lands, is *not* final and conclusive, but may be reviewed by the courts, either State or federal. Letter of Secretary McClelland, dated Dec. 13, 1855, to the Commissioner (Lester's Land Laws, 496); see the Letter of Thompson, of July 22, 1859, to the Commissioner (Id., 571), to the same point. Public notice of Commissioner of March 18, 1857 (Id., 549); Communication of the Secretary of Interior, Jan. 8, 1858 (Id., 558); *Bag-*

*nell* v. *Broderick*, 13 Pet., 436 (p. 451–57); *Wilcox* v. *Jackson*, 13 Id., 498 (511); *Elliott* v. *Piersol*, 1 Id., 328 (340); *Lytle et al.* v. *State of Arkansas*, 9 How., 315 (333); *Ladigo* v. *Roland et al.*, 2 Id., 581 (588–90); *United States* v. *Percheman*, 7 Pet., 51 (59–78); *Satterlee* v. *Matthewson*, 2 Id., 380; *Leissure et al.* v. *Price*, 12 How., 60 (72–77); *Godfrey* v. *Beardsley*, 2 McLean, 412 (419–20); *Arnold* v. *Grimes et al.*, 2 Iowa, 7–19; *Page* v. *Hardin*, 8 B. Monroe, 648 (652 et seq.); *Bryan* v. *Cattell*, 15 Iowa, 538 (541–54).

VI. In addition to the foregoing, plaintiffs' attorneys submitted the following points:

1. The railroad grant is made to the State. The State is the trustee thereof, and has the right to control its appropriation. The certified lists, relied upon by defendant, are made to the State and not to the defendant, and give no title whatever to the railroad company. It can have no rights except through the grant to it by the State; and this grant, when accepted, becomes a *contract* between the State and company. *State ex rel, etc.*, v. *Kirkwood*, 14 Iowa, 162; 6 Cranch, 136. This grant must be enforced and carried out as a contract, as understood by the parties. *Field* v. *Schricker*, 14 Iowa, 119. And if considered as a statute only, it must be enforced as intended by the legislature. 7 Iowa, 246, 275; 14 Id., 218.

2. The grant to defendant can be considered only as a conditional contract, to ripen into an absolute sale of the lands as fast as, under the act of Congress, the State would have the power to sell them, which could not, in any event, be more than twenty miles in advance of the completed portion of the road. The land can be disposed of "only in the manner" pointed out in the act. 14 Iowa, 162; Remarks of Mr. Bennett, chairman of the committee on public lands, on the discussion of the Bill, Cong. Globe, 1 Sess. 34 Cong., 1122; Remarks of Senator

Yulee, Id., 1168; Remarks of Senator Geyer, Id, 1172; Remarks of Senator Jones, Id., 1167.

3. The railroad company has totally and in every particular failed to comply with the terms and conditions of the grant, and having thus failed to comply with the terms of the contract, it has no right to any of these lands. 14 Iowa, 162, *supra*.

4. The railroad company not only have no *right* to the land, but they have no *title*, nor *evidence of title*.

5. Nearly all of these lands in controversy have been sold by the county, as authorized by the State laws. The purchasers have paid therefor in good faith, and the county had, in like good faith, expended the money in reclaiming the land. She had expended $50,000 or $75,000 in draining *these lands*, and had thereby made many of them dry and arable which before were totally unfit for cultivation; and, whatever be the holding on other points, those who purchased and paid for the land in good faith, under the circumstances of this case, must be protected in their purchases. *Fletcher* v. *Peck*, 6 Cranch, 132–137; *United States* v. *Brooks*, 10 How., 460.

Lowe, Ch. J.—The lands in controversy have a legislative history, federal and State, to which it would be well to advert in advance of, and as shedding light upon, the question of priority between the parties.

1. SWAMP LANDS: land grants: legislative history.

They both claim the same lands under distinct grants by Congress, to the State. The plaintiffs insist that they are swamp and overflowed lands, and they deduce their right to the same through the State, under an act of Congress, approved September 28, 1850, entitled "An act to enable the State of Arkansas and other States to reclaim the 'swamp lands' within their limits." The first section

of this act, without reserve or condition, grants to the States, all the lands of the description therein specified which shall remain unsold at the passage of the same. The second section declares what must be done by the secretary of the interior, and the Governors of States, in order to vest the legal title of these lands in the several States.

The third section lays down a rule to be observed in listing or selecting said lands, namely : that, "*in all legal subdivisions, the greater part of which is wet and unfit for cultivation, shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.*"

This act does not point out the particular mode to be followed by the secretary, in making the required list and plats, nor how he was to obtain the information, in order to comply with the rule above prescribed by Congress. It is manifest, that this information is not supplied by the field-notes of the original survey. A summary of objects and data required to be noted by the surveyor will be found stated on pages 716, 717, of Lester's Land Laws. Among them, bearing upon the character of the land, are, first, its general topography, whether level, rolling, broken, or hilly; second, the quality of the soil, whether first, second, or third rate; and, third, whether the bottom lands were wet or dry, and if subject to inundation, to state what depth.

A literal compliance with these directions by the surveyor would fall far short of affording the requisite information to enable the secretary to determine whether the greater part of a particular forty acre tract of land was swampy or overflowed, in such a sense, under the act, as to render the same unfit for cultivation. If he did so from the field-notes, without more information, it would simply be conjecture. Congress thought best, in its wis-

dom to establish the rule above specified, as a guide to the secretary, not limiting him in the sources of his information to the field-notes of the surveyor, but leaving it to his discretion to make the list and plats of these lands under that rule in the best way he could. It is proper here to state that some time after the passage of the act (September 28, 1850), granting swamp lands to the States, some additional objects of topography were required to be observed and stated in the field-notes of the surveyor, in order to define more clearly the quantity and quality of such land, and to show their distinctive character, whether swampy or otherwise subject to overflow, to an extent that, without artificial means, they would be rendered unfit for cultivation. But this was after the lands in controversy had been surveyed. Lester's Land Laws, 718.

The manner and basis, therefore, upon which these lists and plats should be made, as contemplated by the act, were left open to the judgment of the secretary of the interior.

In November following the passage of the law, J. Butterfield, the then commissioner of the general land-office, with the sanction, we are to suppose, of the secretary, instructed the surveyor-general of this State to make out lists of all the lands thus granted to the State under said act, remarking to him that the only reliable data in his possession from which such lists could be made were the notes of the surveyor on file in his office, and that, if the authorities of the State were willing to accept them as the basis of those lists, he might so regard them. If not, and those authorities furnished him satisfactory evidence that any lands were of the character embraced by the grant, he should so report them; and he states what would be sufficient evidence in the premises, namely, the affidavits of county surveyors and other respectable per-

sons that understood and had examined the lines, etc.
The commissioner then states the general principles which
should govern the surveyor-general in making up these
lists, both where the field-notes are the basis of his action,
and where the State authorities shall conclude to have the
surveys made to determine the boundaries of the swamp
and overflowed lands, and furnishes a form according to
which the lists should be made, directing that one copy of
the same should be transmitted to the several land officers
and another to the general land-office at Washington.    In
the same instructions, the commissioner directs that the
land selected should be reserved from sale, and, after
the selection should be approved by the secretary of the
interior, the register should enter all the lands so selected
in his tract book, as granted to the State by act of 28th
September, 1850, being swamp or overflowed land.

These instructions were continued near ten years with
but little change, for the guidance of the surveyor-gen-
eral and the States in the selection of the swamp lands.
For the confirmation of this statement, the secretary of
the interior, R. McClelland, in a letter addressed to the
commissioner of the general land-office, explanatory of
the swamp land act, dated November 20, 1855, states that
" under it, certain instructions were issued for carrying
it into effect, embracing substantially these propositions :
that when the field-notes of surveyors indicated the
swampy character of the land, they were to be regarded
as conclusive of such character ; and that when the land
is claimed by the State, as such, it shall be by selections
made by duly authorized agents of the State, and accom-
panied by their affidavits that they have examined the
said land, and, being acquainted with the mode of sur-
veying the public land, that the greater part of each forty
acre tract included in such selection, is swampy, etc."
Lester's Land Laws, 521.

Again, on the 12th of January, 1858, the secretary of the interior, J. Thompson, addressed a letter to the commissioner, Hon. A. Hendricks, inquiring whether, in his, the commissioner's, opinion, in bringing to a close the grant of September 28, 1850, in cases of selections reported to his office since the 3d of March, 1857, and in cases where the selections yet remained to be made, the general instructions of November, 1850, were sufficient and should be adhered to, or whether new and additional regulations should be adopted.

In reply to this inquiry, the commissioner first restates the substance of those instructions as follows : " In all cases where the plats and field-notes represent the land as swampy or subject to such overflow as to render them unfit for cultivation, they belong to the State, and will be so certified.

" When lands are claimed by the State under this act, which are not so represented on the plat and field-notes, you will require the production of satisfactory evidence that the greater part of each forty acre subdivision of the land is of the character specified in the act."

He then remarks that this point has always been maintained by this office; and that if any instructions, heretofore issued, have been otherwise construed, it has been an error.

In reference to the necessity of an examination of the surface of the land in each subdivision, he gave, among others, as a reason, that probably many of the lands were surveyed in dry seasons, and hence, their character for swamp or overflowed lands were not indicated by the descriptive notes and plats, etc.

In conclusion, he states, in answer to the secretary's inquiry, that he could not perceive, in view of the clear and definite character of the instructions and to which

the authorities of the State had made no objection, that any additional instructions or regulations were required.

I have been particular in getting at the real character of these instructions, and the length of time they obtained under the authority and with the sanction of the interior department, for reasons which will hereafter appear.

As the act granting these lands contained no specific directions to the secretary as to the means to be employed or the manner in which he should select them, and as the field-notes of the surveyor did not contain data suffi- ciently full to enable him adequately to carry out the rule which the law laid down for their selection, we sup- pose it was quite competent for the secretary, through the commissioner, to adopt the form and mode of selection suggested in the instructions which we have just been considering. Under these, the State had the option of adopting one or the other of the two methods; either to make the field-notes of the survey the basis of their selection, or to accept the grant upon the basis of a re-survey, and examination of the surface of land, in order to determine with more precision the quantity and boundaries of the swamp and overflowed lands, furnish- ing the requisite satisfactory evidence of the same. The States of Michigan and Wisconsin adopted the former; this State, with others, elected to take the latter course. See acts of the General Assembly, passed February 2d, 1851, Rev. 148.

The act of Congress granting these lands made the secretary of the interior the executive officer for carrying the same into effect. In December, 1857, it became necessary for him to determine at what period the grant took effect, whether it was at the date of the law or when the patent issued. In determining this question, he says: "The granting clause in the first section, namely the

words, " *are hereby granted*," seemed to him to import a grant *in presenti*. They confer the right to the land, though other proceedings were necessary to perfect the title. Lester's Land Laws, 549. This construction of the act, by the secretary, then A. H. H. Stuart, was subsequently confirmed by J. S. Black, attorney-general, in a very clear and able opinion addressed to Jacob Thompson, who was the secretary of the interior at the time, founded upon certain judicial authorities to which reference was made. Lester, 564.

It was also confirmed by Congress, as we think we have reason to infer from the character and objects of an act passed March 2, 1855, entitled "An act for the relief of purchasers and locaters of swamp and overflowed lands."

The circumstances giving rise to this act are understood to be these: the lands covered by the grant were not and could not be listed at once, and, therefore, could not be withdrawn from market without at the same time withdrawing the whole mass of public lands; and inasmuch as entries and locations with land-warrants of the public domain were made in a large number of instances without examination of the character or quality of the same, and the local officers, not having the data in the absence of selections, to make the proper descrimination, the result was, that a very large amount of the swamp lands were disposed of to private parties by the government, at the local land-offices.

Now, the effect of all this, under the foregoing decision of the secretary of the interior that the right to these swamp lands vested in the States at the date of the passage of the law, was to render the title of the private entries and locations exceedingly uncertain, if not altogether ineffectual. Hence it was but natural that those holding lands under such titles should feel dissatisfied

with their purchase, and seek some kind of relief at 'the hands of Congress.

On the other hand, when the State, by its agents, came to select and list these lands, it found its rights too largely interfered with, to allow it to pass without protest, and lodged a complaint against these intermeddlers, and insisted upon the priority of her claim under the law.

The manner in which Congress adjusted this complaint under the provisions of the act, March 2, 1855, shows, quite unmistakably, that the construction which Congress entertained of the act granting the swamp lands, was accordant with that of the secretary of the interior and the attorney-general; otherwise, upon the hypothesis that no right to these lands had vested in the State, Congress could not have felt any necessity of extending the relief granted, of validating these private entries, and directing patents to issue thereon; nor, on the other hand, of granting to the State the indemnity therein offered, except upon the idea of a previous investiture in her of the title and right to these lands.

We have not thus referred to the construction which Congress, the attorney-general and the secretary of the interior, have given to this act (and we are not advised that any other executive officer of the government, at any time, has expressed a contrary opinion), because we feel it necessary to adopt the same opinion in the disposition of these cases. We expect to place our decision of them on other grounds, and will reserve our opinion, as a court, upon the proposition whether the act grants a present right or not, until the question becomes a vital one in some other case. It may not be out of place, however, for the writer of this opinion to suggest that, after a more careful examination of the question, he is confirmed in the opinion expressed on the same subject in the case of *Allison* v. *Halfacre* (11 Iowa, 450).

But let it be stated, that we have referred more particularly to the above official, legal and legislative opinions, as constituting a part of the history of the swamp lands, and for the purpose of explaining the conduct of the General Assembly of this State; in granting the same to the counties where they may be situated, which it did as early as January, 1853, as well as accounting for all the legislation and dealings of the State with these lands, from the time the secretary of the interior officially declared the act granting them to be one *in presenti* (*nemine contradicente*). Rev., 148 to 160, inclusive.

After this exposition of the effect of the grant, we suppose the State, without provoking unjust criticism, could properly assume the control and ownership of these lands, and deal with them in such way as to attain the objects contemplated by the act of appropriation; first providing, however, for their selection and approval thereof by the department of state.

Now, in the matter of selecting and listing these lands, let us see what the plaintiffs in these cases have done. The 2 — swamp land selections: Mills & Fremont counties. evidence shows that in April, 1853, the county judge of Mills county appointed O. N. Tyson, a county surveyor, the agent to select the swamp lands in that county. The selections were made, and a list thereof returned into the county judge's office on the 31st of December following. The same was duly verified by the affidavit of the selecting agent, to the effect that he understood and had examined the lines bounding the tracts therein designated, and that each quarter was swamp or overflowed lands, and of the character embraced in the act of Congress approved September 28, 1850. This list was reported to the secretary of state, and by him, on the 1st of February, 1854, duly certified to the surveyor-general of this State, who forwarded the same to the general land-office at Washing-

ton, on the 20th of September, 1854; with the certificate that he had carefully compared the lists of selections with the field-notes, plats and other evidence on file in his office; and that, by the affidavits of the said county surveyor and State locating agent, it appeared that the greater part of each smallest legal subdivision of the lands embraced in said list was swampy or subject to such overflow as to render it unfit for cultivation, and that it was therefore of the character contemplated by the act of September 28, 1850. The surveyor-general, Warner Lewis, at the same time sent a transcript of this list of swamp lands to the register of the land-office of the district where the same were situated. About the same time, the evidence shows that the register received from the commissioner of the general land-office, John Wilson, a letter dated September 30, 1854, directing him, on receipt from the surveyor-general of lists of swamp and overflowed lands selected for the State of Iowa, in his district, to note each tract therein embraced, in "its proper place, on his tract books," and not to permit any entries or locations upon any part of the same.

This list includes all the lands now in controversy in Mills county. They were selected from actual observation by a county surveyor and sworn to, reported to the surveyor-general, and by him to the general land-office, in the years 1853 and 1854, nearly two years prior to the passage of the railroad grant.

The lands in Fremont county, in controversy, amount to some $14,255\frac{62}{100}$ acres, and were selected in nearly equal quantities at two different periods, and in the same manner that the selections were made in Mills county. The first list was made out, authenticated, returned, ratified and approved both by the surveyor-general and commissioner of the land-office at Washington, and with-

drawn from market at the local land-office, all within the year 1854.

The second list of selections were made and duly verified in March, 1856, reported to and fully indorsed by the surveyor-general, and by him were forwarded and filed in the general land-office on the 27th of January, 1857; about the same time, they were designated as swamp lands on the tract book of the local land-office at Council Bluffs, and, by order of the commissioner, withdrawn from sale.

We are unable to perceive any irregularity or departure from the instructions of the interior department, for the selection and listing of these lands, to which we have above referred. Their very full and emphatic approval by the surveyor-general of this State, to whom, under specific instructions, had been intrusted the duty of superintending these selections, and who, after a careful comparison of the same with the data and notes of topograph accompanying the original survey, declared that they were of the character and description of swamp and overflowed lands contemplated in the act of appropriation. This, with their subsequent recognition as such by the commissioner of the general land-office, and withdrawal from public sale on the tract book at the local offices, it would seem ought to settle the regularity and accuracy of the selections, and that they were in accordance with the rules of previous instructions from the department. It is worthy of note that we find no legal testimony in all the papers of these cases impeaching the *bona fides* of the selections mentioned herein, except the certifications thereof years afterward by the commissioner to the department. The circumstances and ground upon which this was done will appear further on.

The point next to be noticed in order in the history of these lands, are the difficulties and embarrassments result-

3. —— invest- ing from the action of the interior department,
ment of title
in the State.   in carrying out the provisions of the act,
March 2d, 1855, for the relief of purchasers and locaters
of swamp lands, according to their understood intent and
meaning.

A very large number of controversies at once sprung
up, which led to great excitement, exasperation and
expense, a detailed explication of which is not now
necessary, but which terminated, on the memorial of the
General Assembly of this and perhaps other States, in
the passage by Congress of an act of repose, approved
March 3d, 1857, to the effect that the selections of swamp
and overflowed lands, heretofore made and reported to
the commissioner of the general land-office, so far as the
same remain vacant and unappropriated, should be con-
firmed, approved and patented to the States, as soon as
practicable, agreeably to the provisions of the act grant-
ing the same.  Lester, 285.

The circumstances giving rise to this confirmatory act,
as well as the obvious import of the language itself, leave
no doubt whatever of its meaning and intent,
4. —— in Fre-
mont and Mills  of investing absolutely in the several States
counties.
such lists of swamp and overflowed lands,
whether actually so or not, as had before that time been
made out and reported to the commissioner of the gen-
eral land-office ; and such, precisely, was the category
of the lands now in dispute.  They had not only been
listed and reported, but their selection had been made in
strict compliance with the rules prescribed by the interior
department, and all returned, approved, and withdrawn
from public sale before this act in question was passed.
Now, whatever doubt there may exist as to the precise
time when the title to these lands vested, under the orig-
inal act granting the same, there cannot be the slightest
semblance of a question that the effect of this act was the

immediate investure of the title to all the selections made and reported at the date of the law, which did not interfere with actual settlements made under pre-existing laws; and such is the construction which the secretary of the interior very properly gave this act, again and again (Lester's Land Laws, 558, 562, 563, 565, 567, 570); and, under that construction, very many contests in regard to the character of these lands, pending at the passage of this act, fell to the ground thereafter, and were no longer the subject of disputation. This act, being mandatory and absolute in its terms, its effect was intended to compose all differences about the character of the selections made and reported; so that the power of the secretary of the interior over these questions was exhausted and at an end, and he had left, no duty to perform in reference to them, except the mere ministerial duty of furnishing the several Governors of the States with a true certified list thereof, from the commissioner, under the seal of his office, which is all the patent or evidence of title required under another act of Congress approved August 3, 1854 (Lester, 236); and also the additional duty of determining whether any of these reported selections had been otherwise appropriated or interfered with by legal settlements.

Subject to this qualification, the right of the State to demand a certificate of these selections cannot be questioned; and it is this right to demand which constitutes the plaintiff's claim, and which, we suppose, in a court of justice, is equivalent to the title; the certified list, when made, only the evidence thereof.

5. —— right to certification.

Having traced out the nature and foundations of the plaintiff's right and claim to these lands, let us see next the nature and basis of the defendant's claim to the same lands.

Derived, as it is, from an act of Congress, approved May

15, 1856, appropriating land to the State in alternate
sections to aid in the construction of certain
lines of railway therein specified, it will not
do to overlook the restrictions and reserva-

6. —— rail-
road land
grants.

tions which it contains, as qualifying the rights of the
State under the grant, and the date at which she would
take under the same. First, it reserves from the operation
thereof all lands heretofore appropriated for the purpose
of aiding in any objects of internal improvement, or for
any other purpose whatever. This reservation is suffi-
ciently broad to except the swamp land grant; besides,
we are not at liberty to suppose that Congress would be
guilty of the folly of granting the same lands for two
distinct objects. Second, the enacting or granting clause
contains this provision:

"But in case it shall appear that the United States
have, when the lines or routes of said roads are definitely
fixed, sold any sections or any parts thereof, granted as
aforesaid, or that the right of pre-emption has attached to
the same, then it shall be lawful for any agent or agents,
to be appointed by the Governor of said State, to select,
subject to the approval of the secretary of the interior,
from the lands of the United States nearest to the tiers of
sections above specified, so much land in alternate sections
as shall be equal to such lands as the United States have
sold or otherwise appropriated, or to which the right of
pre-emption has attached."

The object of this provision is too clear for misapprehen-
sion. It was to keep the grant open, so as not to prevent
private entries from going on, or other disposition of the
same by the government, until the lines of the several rail-
ways were definitely established, before which it would be
impossible, in the nature of things, for the right of the
State to attach, for the reason that the grant is limited to
odd sections within a prescribed distance from such line.

In the absence of such a restriction, the difficulties that arose under the swamp land grant (to relieve against which the act of March 2d, 1855, above referred to, was passed by Congress) would have been duplicated. Congress was confined either to this restriction, or the withdrawal of all the public lands in the State from sale, for the time being, or otherwise, witness a repetition of the conflicts and embarrassments .that grew out of the swamp land grant, for the want of a similar restriction. Now, as entries at large were permitted under this railroad grant up to the time that the line should be definitely fixed, it will hardly be contended that a party having a pre-emption right on, or who should be a purchaser of one of the odd sections after the date of the grant, but within its limits, as subsequently ascertained by a final location of the route, could be divested of his right and title by the superior claim of the railroad company. If not, upon what principle is it that the defendant in this case claims priority of right over the plaintiffs to the lands in dispute, when the final location of the line of its road was not definitely determined until the 24th of March, 1857, being subsequent in date to the act confirming irrevocably the title thereto as swamp lands.

There can be but one answer to this, worthy of our consideration, which is, that, inasmuch as the commissioner of the general land-office, under the real or supposed authority of the secretary of the interior, has certified these lands to the department, his action in the premises, whether right or wrong, being political and executive in its character, cannot be reviewed or drawn in question by the courts of the country.

7. —— certification void.

This is the principal and certainly the most important point of the defense in these cases. It merits attentive consideration, and should be preceded by a statement of

some of the circumstances leading to the certification in question.

First, it will be remembered that, as early as 1851, the secretary of the interior declared the swamp land act a present grant; that shortly thereafter, the legislature of this State granted these lands to the counties; that Fremont and Mills counties, plaintiffs herein, proceeded to select the same, pursuant to instructions emanating from the interior department; that these selections were of the character contemplated by the act, as proven in the manner prescribed in the instructions, and certified to by the surveyor-general, ratified and approved by the commissioner, entered as such on the tract books of the local offices, and withdrawn from public sale. Afterward, but before the defendant had the route of its road definitely fixed, Congress, by a special act, March 3, 1857, confirmed the selections, and directed that they should at once be certified to the State as swamp lands. The effect of this act, in the opinion of the secretary, as he frequently expressed it, was to foreclose all questions in regard to the swampy character of these lands, leaving no duty for him to perform in relation thereto, except to determine how far these selections, so confirmed, were interfered with by prior vested rights under other acts of Congress.

The secretary had informed the commissioner (Lester, 537) that, before title to railroad lands would vest, the route must be staked off and marked upon the ground in such manner as to indicate clearly the fixedness of the line; that the mere survey of the line fixes nothing; that it is only means of information, not location. He says, " definitely fixed " implies fixed without capacity of change. Attorney-General Cushing, speaking of the Iowa railroad grants, informs the secretary that, whilst they are conditional grants, *in presenti*, yet they are in the nature of

floats, which do not attach to any particular parcel of the public lands, until the necessary determinative lines of railroad shall have been definitely fixed. Now, in this ⋅ sense, the defendants' line was not permanently established till March 24, 1857, which was posterior to the confirmation of plaintiffs' title by act of Congress. This fact, in the opinion, both of the commissioner of the general land-office, Mr. Hendricks, and Mr. Thompson, the secretary of the interior, as expressed in letters to each other, dated the 2d and 10th of December, 1858 (Lester's Land Laws, 566–7), established the priority of plaintiffs' claims, under the confirming act of March 3, 1857. Yet, under all these circumstances, and notwithstanding the plaintiffs had, in the mean time, sold much of these lands, and, as the evidence shows, had expended many thousand dollars in reclaiming the same, according to the expressed purpose of the grant, Mr. Edmunds, a new commissioner of the general land-office, on the 25th of March, 1862, certified the lands now in dispute as inuring to the State for the use of the defendant, under the railroad grant, May 15, 1856, being some seven or eight years after the same had been selected and approved as swamp lands, by his predecessors, and more than five years after they had been confirmed to the State as swamp lands by a special act of Congress.

Now, as this act was directly in opposition to the declared views of the former officers of the interior department and land-office, to which we have already referred, and also against the express legal opinion of the attorney-general, Black, Nov. 10, 1858 (Lester, 564), in which he held, with great show of reason, that where lands are claimed under a swamp and a railroad grant, either of which would be good if the other was out of the way, the elder one must prevail, "*prior est tempore potior est jure*," it is interesting to learn how this was brought about, and upon what

pretense it was done. It will be remembered that soon after the railroad grant was made, in 1856, the interior department was prevailed upon, by parties interested in this grant, to suspend the certification of swamp land selections until an adjustment could be made of the rights of the parties under the two grants. For four years thereafter, the commissioner and secretary failed to reject any portion of these selections on the one hand, or to certify the same to the State for the benefit of the railway companies on the other. In the mean time, however, they settled questions of conflict between the two grants arising in this and other States, and adopted rules for executing the same, under which they never could have done so, without a change of opinion as to the construction of these acts, as we have before shown.

After they retired from office, and were succeeded by Mr. Smith as secretary and Mr. Edmunds as commissioner, the agents of defendant, General Dix, president of the Mississippi & Missouri R. R. Co., and a Mr. Steiger, its land agent at Washington, renewed the application for the certification of these lands to the defendant, and persistently urged the same until Mr. Edmunds finally complied. But before he could certify he must first register them from the swamp selections. This he accomplished by passing through the selections and casting out of the lists those tracts in odd sections within the range of the railway grant, which the field-notes of the surveyor did not indicate to be swampy and overflowed in such manner as to render them unfit for cultivation; thereby overhauling and undoing all that the State and counties had done at much expense under a rule for the selection of these lands, prescribed by his predecessor, and acquiesced in by the department for a series of years. He professed to derive his authority for doing so from a letter of instructions written by the secretary of the interior, dated February

8, 1860. That he failed to apprehend the true import of this letter as applicable to the facts of these cases, there can be but little doubt. A transcript of this letter is in the record ; it will not be found in Lester's Land Laws.

Conflicts between the swamp and the road grants assumed different phases, according to the diverse facts under which they sprung up.

The letter in question is, generally, designed to cover all and not particular cases, and was intended to lay down rules of adjustment that would meet each class of cases therein specified.

The first class, and the rule applying thereto, is this: that when the lands are claimed under both grants, and the title under the railroad grant had vested *after* the passage of the confirmatory act, March 3d, 1857, as evidenced by a definite location of the line of road, then the title should be completed under the swamp act.

The second class is, when claim is made under both grants, and the title under the railway grant vested, as aforesaid, *before* the passage of act March 3, 1857. The rule prescribed in this phase of the conflict looked to an investigation into the character of the swamp selections ; and the commissioner was directed to examine these selections in the light of the field-notes of the surveyor and the papers on file and of record, and, if the claim under the older grant was satisfactorily established, to affirm the title under the same, otherwise to certify the title under the junior grant.

We need not notice the other cases of conflict mentioned in this letter. They refer to selections of swamp land made subsequent to the act of March 3, 1857, and would have no particular pertinency to the cases before us.

Now, the mistake which we think the commissioner made, was in applying the rule of adjustment laid down for settling conflicts in the second class, to those of the

first class, within which, the evidence shows, these cases fall; and it may not be out of place to suggest that, inasmuch as the act of rejection mentioned was not only without authority but really at variance with the instructions of the secretary of the interior, the same should be treated as a void act.

But afterward he certified these rejected swamp lands to the defendant; and it is said his act in this respect was approved by Secretary Smith. This is true; yet both the certification and approval contained this qualification : that they did so subject to the conditions of the grant, and any. valid interfering rights which might exist. This reservation would seem to imply hesitation and doubt of the propriety of the act; whilst rights injuriously affected thereby might be in some way redressed.

Nevertheless, it is now claimed that this act of certification, being political and executive in its character, and the formal disposition of the soil, concludes all judicial inquiry into any antecedent right or claim which may be set up to the same.

That the power to make all needful rules and regulations for the disposition of the public lands, under the Constitution, belongs to Congress, is no longer 8. —— acts of executive an open question in this country. When, officer : violation of vested within these rules and not interfering with rights. previously acquired substantial rights, the government officers do dispose of the public domain, the title will not be allowed to be gainsaid or impeached. We do not understand the authorities referred to by the defendant to go any further than this.

On the other hand, if a legal or vested right is in any way impaired or violated by an executive officer of the government, even in the matter of certifying lists of land granted previously by Congress, we suppose such violation to fall as legitimately within the judicial cognizance of the courts,

as if the same right had been invaded by an individual or the legislative department of the government. We take it to be a well established principle of law, that when a party, in the prosecution of a right, does everything which the law requires, and fails to attain his right by the misconduct, negligence, ignorance or mistake of a public officer, the law covers and will protect the right. The following are some of the authorities which will support the principle here laid down: *Lytle* v. *The State of Arkansas*, 9 How., 315; *Leissure et al.* v. *Price*, 12 Id., 60; *Ladiga* v. *Roland et al.*, 2 Id., 581; *Bagnel* v. *Brodrick*, 13 Pet., 436; *Wilcox* v. *Jackson*, 13 Id., 498.

We can add nothing to the force of the facts which we have already detailed, showing that the investiture of the plaintiffs' right to these lands had really taken place anterior to the date when defendants' right attached by virtue of the permanent location of the road line.

If anything was left undone by the plaintiffs in selecting and listing these lands which was required by the act granting them, or by the rules and instructions of the interior department, as to the manner of making and reporting them, in order to make good their right, we have been unable to detect it from the record. But, when, in addition to this, they were recognized by the department as regular and valid, and subsequently confirmed by Congress, after they had been separated from the mass of other public lands and designated by legal divisions and subdivisions, what other acts could the government have done to have more effectually vested the right in and to these lands than those just enumerated?

And if the plaintiffs have a vested right, why are they not entitled to a stand in a court of justice, as have all other parties with invaded legal rights? The reply is, they are concluded by the act of the commissioner who rejected them as swamp lands, and certified them as rail-

road lands. But suppose these same lands had been taken up by private entries (the swamp grant act being out of the way)· at any time before the line of the roads were definitely fixed, and they should afterward be certified by the commissioner to the defendants as railroad lands; would such certfication conclude the rights of private purchasers, although they had not yet obtained their patents? It seems to us that upon no fair principle of interpretation of these several acts of Congress could the certificate of a mere ministerial officer have that effect.

Congress never intended to attach such undue solemnity to these certificates, as will abundantly appear from the language of an act passed August 3, 1854, which, while it provides that the certified list by the commissioner shall have the effect to convey the fee simple of all the lands embraced in said lists that are of the character contemplated by the act of Congress, and intended to be granted thereby, yet further declares "*that, when lands embraced in such lists are not of the character embraced by such act of Congress, and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim or interest shall be conveyed thereby.*" Lester's Land Laws, 236.

This negatives the conclusive character of these certificates, and when they are made in the manner supposed, so as to make them null and void, there must be some tribunal to determine that question. If they contravene substantial legal rights, as in this case, we do not see why the courts of the country are not open to afford the adequate redress. Believing that they are, and that the court below decided right in these cases, we shall affirm the same.

Affirmed.