Whitehead v. Plummer.

its face does not so indicate, and we are unable to say such would have been its effect. The judgment must be

AFFIRMED.

WHITEHEAD v. PLUMMER *et al.*

Des Moines River Lands : WHEN THEY BECAME TAXABLE. The act of congress of July 12, 1862, was a grant to the state, *in præsenti*, of the alternate sections of land lying within five miles of the Des Moines river, between the Raccoon forks and the northern boundary of the state, although the grant was made for a designated purpose, and the lands were not certified by the secretary of the interior until April 24, 1875. (Compare *Fremont County v. Burlington & M. R. Ry. Co.*, 22 Iowa, 91.) And said lands became the property of the Des Moines Valley Railroad Company, under chapter 57, Laws of 1868, and became taxable, as soon as the said company had complied with the conditions of said act, which was January 1, 1871, although the secretary of the interior had not yet certified them to the state, and although the governor refused to execute patents therefor to said company until some years thereafter. (Compare *Iowa Homestead Co. v. Webster County*, 21 Iowa, 221, and *Dubuque & Pac. Ry. Co. v. same*, 21 Iowa, 235.)

*Appeal from Emmet District Court.*—HON. GEORGE H. CARR, Judge.

FILED, DECEMBER 19, 1888.

THIS is an action in equity to quiet in plaintiff the title to certain lands in Emmet county. Defendant in a cross-petition demanded the same relief. The district court, on a final hearing, dismissed plaintiff's petition, and entered judgment for defendant, quieting he title in him. Plaintiff appeals.

*John F. Duncomb* and *McCarty & Linderman*, for appellant.

*John Jenswold, Jr.*, for appellee.

REED, J.—Plaintiff's claim is that the land in controversy inured to the state of Iowa under the act of congress approved July 12, 1862, extending the grant of lands for the improvement of the Des Moines river to the northern boundary of the state, and to the Des Moines Valley Railroad Company, under chapter 57, Laws Twelfth General Assembly. Defendant John Conner claims title under two tax deeds executed by the treasurer of the county to F. E. Allen on the tenth of March, 1881, under sales of the land made in 1877 for taxes alleged to be due thereon for 1874, 1875 and 1876. He also claimed one of the tracts under a patent from the United States to a person from whom he holds a conveyance, but we find it unnecessary to consider any question arising under that claim. For the purposes of the case it will be conceded that plaintiff acquired title under the grants from the United States to the state, and from the state to the railroad company, referred to above; and in that view the question upon which the rights of the parties depend is whether the lands were taxable for the years for which they were sold, or either of them.

On the twenty-fourth of April, 1875, the secretary of the interior certified to the state a list of lands, including those in controversy, as inuring under the grant of July 12, 1862, and immediately thereafter the railroad company demanded of the governor of the state a patent or conveyance of the lands included in such list. The governor, however, refused to execute such conveyance, and none was executed until September 30, 1881, at which date the governor executed lists of said lands, as provided by chapter 167, Laws Eighteenth General Assembly.

Plaintiff's position is that the title and ownership of the lands remained in the United States until divested by the certificate of the secretary of the interior, on the twenty-fourth of April, 1875, and that the state was the owner thereof from that time until the execution of said lists by the governor, in 1881. If that claim is sound, it would follow necessarily, under the provisions of the

statute ( Code, sec. 797, subd. 1 ), th at the land was not taxable until 1882. We are of the opinion, howev‍er, that the position is not maintainable. In our judgment, the act of congress of July 12, 1862, was a grant *in præsenti* of the alternate sections of land lying within five miles of the Des Moines river, between the Raccoo n forks and the northern boundary of the state. By its terms the act simply extended the grant made by the act of August 8, 1846, to the territory of Iowa, so as to include the alternate sections lying within five miles of the river, between the points designated, and gave the consent of congress to the application of a portion of the land in aid of the construction of the railroad. The former act was an absolute grant to the territory of the lands designated. Neither it, nor the act in question, reserved to the United States any right or interest in them. True, the grant was for a designated purpose, but in that respect it is similar to the act approved September 28, 1850, granting to the several states the s wamp and overflowed lands lying within them, and that act has always been treated as a grant *in præsenti. Fremont County v. Burlington & M. R. Ry. Co.*, 22 Iowa, 91. We conclude, therefore, that the act of July 12, 1862, had the effect to vest in the state the title and ownership of the lands ; and the only effect of the list subsequently certified by the secretary of the interior was to identify the several tracts which passed under the grant, and clothe the state with an evidence of title to them.

The remaining question, however, is as to when the state was divested of the title and ownership. In 1858, the general assembly granted to said railroad company, then known as the " Keokuk, Fort Des Moines & Minnesota Railroad Company," all lands included in the grant, or which might thereafter be given in extension of it. Ch. 99, Acts 7th Gen. Assem. That act provided for the resumption of the grant by the state, upon a failure of the company to perform certain specified conditions. When the act of 1868 was passed, those conditions had not been performed, and the right to resume had accrued to the state, and this right, and the facts upon which it

arose, are recited in the preamble to the act. By the first section of the act all the reserved rights and interests of the state, in respect to the lands, were relinquished and conferred upon the railroad company, upon certain named conditions. By one of said conditions 100,000 acres of the land were to be set apart and held in reserve for the payment of certain claims against the grant which had theretofore been allowed by the general assembly. Ch. 22, Laws 1866. But it was provided that the railroad company might pay said claims before July 1, 1868, and that, upon satisfactory evidence of such payment having been made to the governor, he should cause the lands so reserved to be patented to it. By another provision, 100,000 acres were to be selected and set apart for the construction of the road from Des Moines to Fort Dodge, and the company was required to construct that portion of its road before the first of January, 1871; and it was provided that, upon compliance with that provision by the company, the lands so reserved should be patented to it. The second section provides that upon non-compliance by the company with those provisions the act should operate as a resumption by the state of all rights under the grant.

The effect of the act is manifest. By its provisions the company, upon compliance by it with the conditions of the grant, became entitled to the lands absolutely. Upon such compliance the state ceased to have any right or interest in them, and it did comply within the time named in the act. The refusal of the governor to execute the patents, as required by the act, in no manner affected the rights of the parties to the property. From the time the company complied with the conditions of the grant the lands ceased to be the property of the state, and from that time they were taxable under the general provision of the statute. Code, sec. 801. The case falls within the holding of this court in *Iowa Homestead Co. v. Webster County*, 21 Iowa, 221; *Dub. & Pac. Ry. Co. v. Webster County*, 21 Iowa, 235, and other cases. The judgment will be

AFFIRMED.